**LIFE PARTNERS, INCORPORATED, Plaintiff–Appellant,**

v.

Theodore V. MORRISON, Jr.; Mark C. Christie, in their official capacities as Commissioners of the State Corporation Commission; Alfred W. Gross, in his official capacity as the Commissioner of Insurance; Judith Williams Jagdmann, in her official capacity as Commissioner of the State Corporation Commission, Defendants–Appellees,

Robert F. McDonnell, in his official capacity as the Attorney General of the Commonwealth of Virginia, Intervenor–Appellee,

and

Clinton Miller, in his official capacity as Commissioner of the State Corporation Commission, Defendant.

National Association of Insurance Commissioners; North American Securities Administrators Association, Incorporated, Amici Supporting Appellees,

and

Viatical Settlement Professionals, Incorporated, Movant.

**Life Partners, Incorporated, Plaintiff–Appellee,**

v.

Theodore V. Morrison, Jr.; Mark C. Christie, in their official capacities as Commissioners of the State Corporation Commission; Alfred W. Gross, in his official capacity as the Commissioner of Insurance; Judith Williams Jagdmann, in her official capacity as Commissioner of the State Corporation Commission, Defendants–Appellants,

and

Clinton Miller, in his official capacity as Commissioner of the State Corporation Commission, Defendant,

and

Robert F. McDonnell, in his official capacity as the Attorney General of the Commonwealth of Virginia, Intervenor–Defendant.

North American Securities Administrators Association, Incorporated; National Association of Insurance Commissioners, Amici Supporting Appellants,

and

Viatical Settlement Professionals, Incorporated, Movant.

Nos. 06–1370, 06–1371.

United States Court of Appeals, Fourth Circuit.

Argued Nov. 30, 2006.

Decided April 30, 2007.

**ARGUED:** Douglas Michael Palais, Leclair Ryan, P.C., Richmond, Virginia, for Appellant/Cross–Appellee. Maureen Riley Matsen, Office of the Attorney General of Virginia, Richmond, Virginia; Robert A. Dybing, Thompson & McMullan, Richmond, Virginia, for Appellees/Cross–Appellants. **ON BRIEF:** Cameron S. Matheson, Leclair Ryan, P.C., Richmond, Virginia; Lee E. Goodman, Robert P. Howard, Leclair Ryan, P.C., Washington, D.C., for Appellant/Cross–Appellee. Faisal S. Qureshi, Thompson & McMullan, Richmond, Virginia; Ronald N. Regnery, Office of the Attorney General of Virginia, Richmond, Virginia; Philip R. de Haas, William H. Chambliss, Pamela B. Beckner, Scott A. White, State Corporation Commission of Virginia, Richmond, Virginia, for Appellees/Cross–Appellants. Rex A. Staples, Stephen W. Hall, Lesley M. Walker, North American Securities Administrators Association, Inc., Washington, D.C., for North American Securities Administrators Association, Incorporated, Amicus Supporting Appellees/Cross–Appellants. Elizabeth Mason Horsley, Williams Mullen, P.C., Richmond, Virginia, for National Association of Insurance Commissioners, Amicus Supporting Appellees/Cross–Appellants.

Before NIEMEYER, MICHAEL, and TRAXLER, Circuit Judges.

Affirmed by published opinion. Judge NIEMEYER wrote the opinion, in which Judge MICHAEL and Judge TRAXLER joined.

## OPINION

NIEMEYER, Circuit Judge.

We decide, in this case of first impression, whether the Virginia Viatical Settlements Act, Va.Code Ann. § 38.2–6000, *et seq.*, which regulates viatical settlements with insureds who are residents of Virginia, is saved from the dormant Commerce Clause of the U.S. Constitution by the McCarran–Ferguson Act, 15 U.S.C. §§ 1011, 1012, as a state law that "relates to" the regulation of the business of insurance or as a state law enacted "for the purpose of regulating the business of insurance."

"Jane Doe," a terminally ill resident of Virginia with 6 to 18 months to live, sold her life insurance policy to Life Partners, Inc., a Texas corporation, at a deep discount to provide her with cash needed for the remaining months of her life. This transaction, known as a "viatical settlement," is purportedly regulated by Virginia to protect its residents who, in the vulnerable circumstances of being terminally ill, might find it necessary to sell their life insurance policies.

Following the transaction, Jane Doe sought to improve the sale price of her policy by invoking the minimum pricing provisions of the Virginia Viatical Settlements Act. Life Partners, contending that the Virginia Act violated the dormant Commerce Clause, commenced this action to declare the Act unconstitutional and to enjoin its enforcement. Virginia defended the Act as serving a legitimate and important local interest in regulating viatical

settlements with its residents. Virginia also argued that, in any event, it properly acted pursuant to the commerce power conferred on it by the McCarran–Ferguson Act, which authorizes States to enact laws relating to or for the purpose of regulating the business of insurance.

On cross-motions for summary judgment, the district court entered judgment for Virginia, holding that the Virginia Viatical Settlements Act did not violate the dormant Commerce Clause. Relying on the balancing test of *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970), the district court concluded (1) that the Virginia Viatical Settlements Act did not discriminate against interstate commerce; (2) that the Act served a legitimate and important local purpose; and (3) that any burden on commerce was only incidental.

On appeals by both parties, we conclude that the sale of life insurance policies by terminally ill patients directly and substantially affects the business of insurance and that the Virginia Viatical Settlements Act "relates to" such business and was enacted "for the purpose of regulating" such business. The McCarran–Ferguson Act thus saves the Virginia Act from preemption of the Commerce Clause and renders it constitutional. Based on this conclusion, we affirm.

I

A "viaticum" in ancient Rome was a purse containing money and provisions for a journey. A viatical settlement, by which a dying person is able to acquire provisions for the remainder of his life's journey by selling his life insurance policy, is thus thought to provide a viaticum. In the language of the industry, the insured is the "viator," who sells his policy at a discount to a "provider" of the viaticum. The viatical settlement provider is often backed by investors under arrangements reached between the provider and the investors. Once a viator sells a policy to a provider, the provider assumes the responsibility for paying the premiums and designates itself as the beneficiary of the policy. Upon the viator's death, the provider collects the face value of the policy, and the provider's profit is the difference between the face value of the policy and the amount paid to the viator, premiums paid to the insurance company, and the administrative expenses incurred. Because the sooner the viator dies the greater the provider's profit, a provider takes special care in calculating a viator's life expectancy by hiring an independent doctor to examine the insured and his medical records and by monitoring the viator's health until death.

The viatical settlements industry was born in the 1980s in response to the AIDS crisis. In the early years, AIDS was a rapidly fatal disease, and its victims usually died within months of diagnosis. Many AIDS sufferers were in great need of cash to pay for their care after they had become debilitated. Their life insurance policies were not only expensive to maintain but could, upon liquidation, provide some of the desperately needed cash. Moreover, investors were willing to purchase the life insurance policies of AIDS sufferers. Inasmuch as AIDS sufferers had predictably short life expectancies, their policies were reliable investments. *See generally*, Liza M. Ray, Comment, *The Viatical Settlement Industry: Betting on People's Lives is Certainly No "Exacta,"* 17 J. Contemp. Health L. & Policy 321, 321–22 (2000); Joy D. Kosiewicz, Comment, *Death for Sale: A Call to Regulate the Viatical Settlement Industry*, 48 Case W. Res. L. Rev. 701, 704 (1998).

The viatical settlements market expanded to include other terminal illnesses, especially as AIDS became a more treatable

disease. People suffering from cancer, heart disease, Alzheimer's disease, and other progressive illnesses, as well as elderly people in need of funds for assisted living, found viatical settlements a useful source of immediate cash. Today, the industry is growing exponentially as investors seek out not only the terminally ill, but the swelling ranks of generally healthy, elderly Americans. It is estimated that $13 billion worth of life insurance policies were sold by policyholders to providers in 2005—up from $5 million in 1989 and $200 million in 1998—and it is projected that by 2030 the number could reach $160 billion. *See* Holman W. Jenkins, Jr., *Life Insurers Face the Future, Grudgingly,* Wall St. J., Aug. 9, 2006, at A11; Liam Pleven & Rachel Emma Silverman, *Investors Seek Profit in Strangers' Deaths,* Wall St. J., May 2, 2006, at C1; *see generally* Miriam R. Albert, *The Future of Death Futures: Why Viatical Settlements Must Be Classified as Securities,* 19 Pace L. Rev. 345, 353–55 (1999).

The need for regulating the business of viatical settlements became apparent from the beginning. The power imbalance between the viator and the provider creates a substantial potential for abuse. The viator is usually in a weakened physical condition, often facing imminent death, often in financial hardship due to medical and healthcare costs, and often ignorant of industry practices. The provider, on the other hand, has extensive resources, is usually backed by investors, and is armed with sophisticated industry knowledge. Moreover, because of his illness and lack of time and energy to "comparison shop" for the best payment, a viator often agrees to sell at a drastically reduced price, particularly when he fails to understand the nature and value of the rights that he has in the insurance policy that he is selling. The potential for harassment of the viator after the sale is also real, as the providers,

acting under the terms of the viatical settlement, closely monitor the viator's health, subjecting him to regular medical examinations. In addition, the life insurance industry began to face new risks, including the increased risk of fraud, as potential insureds sought to hide their illnesses in order to obtain policies and thereafter to sell them to viatical settlement providers. Finally, many have questioned the ethics of an industry whose profits depend on, and whose investors hope for, the early death of its customers.

Because of the need to protect viators and to create a transparent and fair viatical settlements market, the National Association of Insurance Commissioners developed the Viatical Settlements Model Act in 1993 and Viatical Settlements Regulations in 1994 to guide States in their regulation of the viatical settlements industry. To date, approximately 38 States, including Virginia, have adopted a version of the Model Act or similar legislation.

The Virginia Viatical Settlements Act (sometimes hereafter the "Act") was enacted in 1997 to address Virginia's concern with the "potential for exploitation of vulnerable and seriously ill individuals." Legislative Summary, House Bill 871 (Va. 1997). The Commissioner of Insurance for the Bureau of Insurance of the Virginia State Corporation Commission, the state agency charged with implementing and enforcing the Act, stated that some of the Act's specific objectives and purposes include "ensuring that entities providing viatical settlement services are licensed, operated by persons of good character, and do not engage in illegal, unfair or unethical conduct" and "ensuring that fair compensation be paid to viators."

Thus, the core provisions of the Act ensure that providers are reliable; require full disclosures to viators; protect the pri-

vacy of viators; establish minimum prices for policies; and prohibit fraud.

More particularly, the Act requires that brokers (defined as viators' agents) and providers be licensed if they contract with a Virginia resident in connection with a viatical settlement. Va.Code Ann. §§ 38.2–6002, –6003. The Act provides that before issuing a license to a provider, the State Corporation Commission is required to investigate the applicant to ensure it is "competent and trustworthy," "indicates its intention to act in good faith within the confines of the license," "has a good business reputation," and "has provided an anti-fraud plan." *Id.* § 38.2–6002(D). The Act also requires providers to "be bonded" or submit to "other mechanisms for financial accountability" adopted by the Commission. *Id.* § 38.2–6002(I).

The Act imposes extensive disclosure obligations on providers. For instance, providers must disclose to viators, among other things, the "possible alternatives to viatical settlement contracts including any accelerated death benefits or policy loans offered under the viator's life insurance policy"; the tax consequences of selling the policy; the right of a viator to rescind a viatical settlement for 15 days after receipt of the proceeds; the fact that entering into a viatical settlement may cause a viator to forfeit rights and benefits under the policy; the fact that the provider may require medical visits as frequently as once a month to determine the viator's health status; and the possible loss of coverage for third parties if the life insurance policy involves family riders or includes coverage of a life other than the viator's. *See* Va. Code Ann. § 38.2–6007.

Section 38.2–6005 of the Act is devoted to the protection of a viator's privacy and the confidentiality of information about the viator. *See also* Va.Code Ann. § 38.2–6008(A)(1)(b), (B), (F).

The Act requires providers to pay a viator a minimum percentage of the face value of the insurance policy sold, depending upon the viator's life expectancy. Thus, if the viator's life expectancy is less than 6 months, he must be paid a minimum of 80% of the policy's face value; if his life expectancy is at least 6 but less than 12 months, then he must be paid at least 70% of the policy's face value; if his life expectancy is at least 12 but less than 18 months, he must be paid at least 65% of the policy's face value; and if his life expectancy is at least 18 but less than 25 months, he must be paid at least 60% of the policy's face value. *See* 14 Va. Admin. Code § 5–71–60(A) (2006).

And the Act contains several provisions prohibiting false or misleading advertising, Va.Code Ann. § 38.2–6010; prohibiting fraud in connection with viatical settlements, *id.* § 38.2–6011; and making violations of the Act unfair trade practices, *id.* § 38.2–6013.

Other miscellaneous provisions designed to protect Virginia viators are also included in the Act, such as a requirement that providers submit to the Commission all viatical settlement contracts for review and approval before closing. Va.Code Ann. § 38.2–6003(A). Funds must be paid to the viator within three business days after the viatical settlement provider has received the insurer's acknowledgment that the beneficiary of the life insurance policy has been changed. *Id.* § 38.2–6007(A)(6). Before entering into a viatical settlement contract, a provider must obtain "a written statement from a licensed attending physician that the viator is of sound mind and under no constraint or undue influence to enter into a viatical settlement contract." *Id.* § 38.2–6008(A)(1)(a).

Finally, we note that the Act does not regulate the relationship between viatical

settlement providers and their investors, a relationship that is most often regulated by securities laws. *See* Va.Code Ann. § 38.2–6016.

## II

"Jane Doe," a resident of Martinsville, Virginia, who was terminally ill with AIDS, began in March 2004 to explore ways to liquidate her life insurance policy. Her policy had a face value of $115,000 and contained no accelerated death benefit of any value.

Researching on the Internet, Doe located two brokers—Ideal Settlements, Inc., located in New Jersey, and Individual Benefits, Inc., located in North Carolina— and signed brokerage contracts with both. Ultimately, however, she chose Ideal Settlements to negotiate on her behalf. Ideal Settlements contacted Life Partners, located in Waco, Texas, inviting a bid for Doe's life insurance policy.

Life Partners engages nationally in the business of viatical settlements. It locates investors to provide the money, and it negotiates with viators or their brokers for the purchase of life insurance policies. Its profits and those of the investors are determined by the difference between (1) the face amount of the policy paid upon the viator's death and (2) the cost of the policy, the cost of paying premiums until death, and administrative expenses. While Life Partners is licensed as a viatical settlement provider under Texas law, it is not so licensed in Virginia.

Life Partners hired an independent physician to assess Jane Doe's medical condition, and the physician determined that Doe had a life expectancy of 6 to 18 months. Life Partners also located 12 investors from 7 States—none from Virginia—who, acting as a group, were interested in bidding on Doe's policy. On behalf of these purchasers, Life Partners submit-

ted a bid to Ideal Settlements in the amount of $26,000. When Doe rejected that offer, Life Partners raised the bid to $27,000, which Doe also rejected. Life Partners then submitted a final bid of $29,900 which Doe accepted. The bid represented 26% of the face value of Jane Doe's policy.

. Life Partners sent the necessary forms, disclosures, and other information required by Texas law to Doe for her review and signature. Doe completed the forms and executed the viatical settlement, returning them to Life Partners for final review and execution in Texas. Life Partners closed the transaction in Texas on May 13, 2004, and wired $29,900 to Doe in Virginia.

Five months later, on October 11, 2004, Doe contacted Life Partners demanding that it pay her more money, based on the Virginia Viatical Settlements Act. That Act would have required Life Partners to pay Doe at least $69,000, and maybe more, depending on the applicable range of life expectancy. Life Partners refused her demand but offered to rescind the transaction, even though the period for rescission had expired. Doe refused rescission and instead filed a complaint with the Virginia Bureau of Insurance, the relevant enforcement arm of the State Corporation Commission.

The Bureau of Insurance conducted an inquiry and concluded that Life Partners had acted as an unlicensed viatical settlement provider with a Virginia resident. At the request of the Bureau of Insurance, the Virginia State Corporation Commission issued a "rule to show cause" against Life Partners, requiring it to explain why it was conducting business with a Virginia resident without proper licensing, in violation of Virginia law. It also warned Life Partners that unless it subjected itself to

Virginia's regulatory regime, Life Partners would be barred from making any further purchases from Virginia residents, under threat of prosecution for a "knowing and willful violation of the law."

On May 26, 2005, Life Partners commenced this action under 42 U.S.C. § 1983, asserting that the State Corporation Commission and the Bureau of Insurance (herein jointly, "Virginia" or the "Commission") violated the dormant Commerce Clause of the United States Constitution by attempting to enforce the Virginia Viatical Settlements Act against Life Partners. Life Partners' dormant Commerce Clause challenge was particularly grounded on the jurisdictional provision of the Virginia Act which gave the Commission oversight authority over all viatical settlements involving Virginia viators. Life Partners contended that this scope of jurisdiction rendered Virginia's regulatory control so broad that it affected commerce occurring wholly outside of Virginia. It also argued that Virginia's regulatory regime, in particular the licensing requirement and price controls, discriminated against and burdened interstate commerce.

Life Partners filed a motion for summary judgment based on its dormant Commerce Clause challenge, and the Commission filed a cross-motion for summary judgment, contending that it had an important and legitimate interest in regulating viatical settlements and that its law had only incidental effects on commerce. The Commission also argued that Congress had explicitly authorized state regulation of viatical settlements in the McCarran–Ferguson Act, a statute that delegates to the States Congress' commerce power to regulate the insurance industry.

The district court granted the Commission's motion for summary judgment and denied Life Partners' motion, agreeing with the Commission that the Act did not violate the dormant Commerce Clause. The court conducted a full Commerce Clause analysis, concluding that Virginia's regulation of viatical settlements comfortably survived the scrutiny. The district court declined to reach the Commission's argument that Congress had authorized States to regulate viatical settlements with the McCarran–Ferguson Act.

These cross-appeals followed. Life Partners challenges the district court's holding that the Virginia Act does not violate the dormant Commerce Clause, and the Commission challenges the district court's failure to address its argument based on the McCarran–Ferguson Act. The Commission contends also that the district court should have abstained in favor of Commission proceedings, under *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971).

## III

Because we conclude that in the McCarran–Ferguson Act, Congress delegated its commerce power to Virginia in sufficiently broad terms to cover viatical settlements, thereby saving the Virginia Viatical Settlements Act from any dormant Commerce Clause challenge, we need not decide whether, in the absence of such delegation, the Act would violate the dormant Commerce Clause.

Through the McCarran–Ferguson Act or any other act, Congress holds the authority to "redefine the distribution of power over interstate commerce" by "permit[ting] the states to regulate the commerce in a manner which would otherwise not be permissible." *Southern Pacific Co. v. Arizona*, 325 U.S. 761, 769, 65 S.Ct. 1515, 89 L.Ed. 1915 (1945); *see also Northeast-Bancorp, Inc. v. Bd. of Governors*, 472 U.S. 159, 174, 105 S.Ct. 2545, 86

L.Ed.2d 112 (1985) ("When Congress so chooses, state actions which it plainly authorizes are invulnerable to constitutional attack under the Commerce Clause"). Thus, if the McCarran–Ferguson Act authorizes the States to regulate viatical settlements, the issue of whether the Virginia Viatical Settlements Act burdens interstate commerce becomes irrelevant. We therefore address whether the Virginia Act falls within the scope of the McCarran–Ferguson Act.

The McCarran–Ferguson Act was passed in 1945 in reaction to the Supreme Court's decision in *United States v. South–Eastern Underwriters Ass'n*, 322 U.S. 533, 64 S.Ct. 1162, 88 L.Ed. 1440 (1944). Prior to that decision, it had been understood that "[i]ssuing a policy of insurance [was] not a transaction of commerce." *Paul v. Virginia*, 75 U.S. (8 Wall.) 168, 183, 19 L.Ed. 357 (1868). Consequently, "the States enjoyed a virtually exclusive domain over the insurance industry." *St. Paul Fire & Marine Ins. Co. v. Barry*, 438 U.S. 531, 539, 98 S.Ct. 2923, 57 L.Ed.2d 932 (1978). Before *South–Eastern Underwriters*, the States regulated the insurance business free from any concerns arising under the dormant Commerce Clause, and federal statutes, such as the Sherman Act, were thought to be inapplicable to the insurance industry. *See SEC v. Nat'l Securities, Inc.*, 393 U.S. 453, 457–58, 89 S.Ct. 564, 21 L.Ed.2d 668 (1969). In *South–Eastern Underwriters*, the Supreme Court altered this understanding by holding that the business of insurance was a part of interstate commerce and therefore subject to the Commerce Clause and federal enactments based on the Commerce Clause, such as the Sherman Act. *South–Eastern Underwriters*, 322 U.S. at 552–53, 64 S.Ct. 1162.

Congress reacted by enacting the McCarran–Ferguson Act the very next year. Making its mission unmistakably clear, Congress declared "that the continued regulation and taxation by the several States of the business of insurance is in the public interest." 15 U.S.C. § 1011. Shortly thereafter, the Supreme Court stated, "obviously Congress' purpose was broadly to give support to the existing and future state systems for regulating and taxing the business of insurance." *Prudential Ins. Co. v. Benjamin*, 328 U.S. 408, 429, 66 S.Ct. 1142, 90 L.Ed. 1342 (1946). The McCarran–Ferguson Act achieved this purpose "by removing obstructions which might be thought to flow from [Congress'] own power, whether dormant or exercised," and "by declaring expressly and affirmatively that continued state regulation and taxation of this business is in the public interest and that the business and all who engage in it 'shall be subject to' the laws of the several states in these respects." *Id.* at 430, 66 S.Ct. 1142.

To understand the McCarran–Ferguson Act as it might apply in this case, we start with "the language of the statute itself." *Group Life & Health Ins. Co. v. Royal Drug Co.*, 440 U.S. 205, 210, 99 S.Ct. 1067, 59 L.Ed.2d 261 (1979).

■ The substantive portions of the McCarran–Ferguson Act are found in its first two sections. The first provides:

> The Congress hereby declares that *the continued regulation and taxation by the several States of the business of insurance is in the public interest,* and that silence on the part of the Congress shall not be construed to impose any barrier to the regulation or taxation of such business by the several States.

15 U.S.C. § 1011 (emphasis added). And the second provides:

> (a) State regulation. The business of insurance, and every person engaged therein, shall be subject to *the laws of*

*the several States which relate to the regulation or taxation of such business.* (b) Federal regulation. No Act of Congress shall be construed to invalidate, impair, or supersede *any law enacted by any State for the purpose of regulating the business of insurance,* or which imposes a fee or tax upon such business, unless such Act specifically relates to the business of insurance: Provided, That [the federal antitrust laws] shall be applicable to the business of insurance to the extent that such business is not regulated by State law.

*Id.* § 1012 (emphasis added). Section 1011 thus declares that the "business of insurance" continues to be subject to regulation by the States, as had been the case before *South–Eastern Underwriters.* Section 1012(a) then confers the federal commerce power on the States to enact laws which "relate" to the regulation of the business of insurance, and § 1012(b) restricts federal authority so that no federal law can be construed to "invalidate, impair, or supersede" any state law enacted "for the purpose of" regulating the business of insurance—unless the federal law does so explicitly. By so restricting federal authority, § 1012(b) also defines the scope of state authority, implicitly authorizing States to enact laws "for the purpose of" regulating the business of insurance. *See U.S. Dep't of Treasury v. Fabe,* 508 U.S. 491, 504, 113 S.Ct. 2202, 124 L.Ed.2d 449 (1993) (explaining that § 1012(b) "was intended to further Congress' primary objective of granting the States broad regulatory authority over the business of insurance").

In short, the McCarran–Ferguson Act "declares" that regulation of the business of insurance belongs with the States, and to implement that declaration, the Act explicitly protects from a dormant Commerce Clause challenge (1) any state law that "*relates* to the regulation of the business of insurance" or (2) any state law "enacted *for the purpose* of regulating the business of insurance." The Act reserves from its operation only the federal antitrust laws. 15 U.S.C. § 1012(b).

Important to a proper application of these provisions is an understanding of the terms (1) "insurance," (2) the "business of insurance," (3) the nature of laws that "relate to" or are enacted "for the purpose of" regulating the business of insurance, and (4) the historical context in which Congress enacted the McCarran–Ferguson Act.

A contract of insurance is one by which an insured transfers risks to an insurer for the payment of a premium. *See Union Labor Life Ins. Co. v. Pireno,* 458 U.S. 119, 130, 102 S.Ct. 3002, 73 L.Ed.2d 647 (1982). And so, under a life insurance policy, the insured purchases a hedge against his early death by the insurer's commitment to pay the face amount of the policy. Because the insurer must pay the insured's beneficiary even upon an early death, the insurer takes the bet that the insured will not die before the premiums and investment income accumulate to exceed the face amount of the policy. The cost of the insured's risk, represented by the amount of premiums, is calculated so as to match the anticipated premium amount with the anticipated payout plus a profit.

Thus, both parties to an insurance contract have a large array of factors to consider in determining whether to enter into a contract of insurance. The insurer considers, among other things, the insured's age and life expectancy, health, work, healthcare and life habits, family history, and similar data from its relevant pool of insureds. The insurer also considers the market for the investment of premiums, data from the pool of insureds relating to

the lapsing and early surrender of policies, and marketing, selling, and administrative expenses. The insured, on the other hand, considers, among other things, the insurer's financial strength, its history of honoring policies, its investment record, the risk represented by the relevant pool of insureds, and the insurer's service. But in the end, *both parties* enter into the contract of insurance with the hope that the insured will not die early. That hope is reflected in the insurer's acceptance of the bet that the insured will not die before premiums and investment income at least equal the face amount of the policy, and that hope is inherent in the insured's will to live as part of human nature.

The "business of insurance" refers to the marketing, selling, entering into, managing, servicing, and performing of insurance contracts. *See National Securities,* 393 U.S. at 460, 89 S.Ct. 564 (explaining that in the McCarran–Ferguson Act, "Congress was concerned with the type of state regulation that centers around the contract of insurance," including "the type of policy which could be issued, its reliability, interpretation, and enforcement"). Thus, "[t]he relationship between insurer and insured," which is the heart of the insurance contract, is also at "the core of the business of insurance." *See id.* ("Whatever the exact scope of the statutory term ['business of insurance'], it is clear where the focus was—it was on the relationship between the insurance company and the policyholder"). In applying these principles, the Supreme Court has distinguished state statutes that regulate the merger of insurance companies, which are aimed at "the relationship between a stockholder and the company in which he owns stock," from statutes that directly affect contracts of insurance, their risks, and their performance. *See National Securities,* 393 U.S. at 460, 89 S.Ct. 564 (explaining that even though the state merger statute only ap-

plied to insurance companies, "[t]he crucial point is that here the State has focused its attention on stockholder protection; it is not attempting to secure the interests of those purchasing insurance policies"). Thus, at bottom, any understanding of the scope of what amounts to the business of insurance must be based on the "common-sense understanding" of whether the business relates to or affects "the risk pooling arrangement between the insurer and insured." *Ky. Ass'n of Health Plans, Inc. v. Miller,* 538 U.S. 329, 341–42, 123 S.Ct. 1471, 155 L.Ed.2d 468 (2003) (examining the scope of the business of insurance in determining whether, under ERISA, a state law regulates insurance); *see also Pireno,* 458 U.S. at 129, 102 S.Ct. 3002.

Finally, we understand that the McCarran–Ferguson Act confers more commerce power to the States than is necessary simply to regulate the business of insurance directly. The grant of power sweeps more broadly, giving States the power to enact laws that "relate to" the regulation of the business of insurance or are enacted "for the purpose of" regulating the business of insurance. *See Fabe,* 508 U.S. at 504, 113 S.Ct. 2202 ("The broad category of laws enacted 'for the purpose of regulating the business of insurance' consists of laws that ... necessarily encompass[ ] more than just the 'business of insurance'"). This grant of power to the States was deliberately broad "to allay fears" about the "widely perceived ... threat to state power" that followed the Supreme Court's decision in *South–Eastern Underwriters. See Fabe,* 508 U.S. at 499–500, 113 S.Ct. 2202; *see also Prudential Ins. v. Benjamin,* 328 U.S. 408, 429–30, 66 S.Ct. 1142, 90 L.Ed. 1342 (1946).

## IV

With this understanding of the McCarran–Ferguson Act, we now turn to address

whether the Virginia Viatical Settlements Act is protected from a dormant Commerce Clause challenge as a state law that *relates to* or was enacted *for the purpose of* regulating the business of insurance.

While obvious, it must first be stated that the subject of every viatical settlement is an insurance policy. Moreover, the viatical settlement is not collateral to the policy. Rather, it modifies it, changing the parties' obligations and benefits, while yet leaving the insurance—i.e., the transfer of the specified risk—in place. At its essence, a viatical settlement is a transaction that fractures the two-part insurance contract between the insurer and the insured and creates a new tripartite arrangement (albeit not a three-party agreement) among the insurer, the insured, and the insured's assignee—the viatical settlement provider. Because of this new tripartite arrangement, each party has, with respect to the preexisting insurance contract, new or different obligations and benefits.

The insurer is faced with the newly divided obligations reflected in the interests of the insured and the viatical settlement provider. While the insured gives up her financial interest in the insurance contract, her life and the risk of her death remain the subject of the insurance contract. But now, the insurer, instead of carrying its obligation to pay on the insurance contract with an insured "who guards against possible loss and disaster to [her] as an individual," *see* 1 Appleman on Insurance § 1 (2d ed. 2006) (defining life insurance), carries its obligation with a viatical settlement provider, who hopes, for financial reasons, for the early death of the insured. The insurer must also now keep track administratively of both the insured, whose life remains essential to the arrangement, and the viatical provider, who now must pay the insurer the premiums. Moreover, the fact that a new contract—the viatical settlement—introduces a new interested party to the arrangement raises the possibility that the insurer can become involved in legal disputes between the insured and the viatical provider.

The insurer is also faced with changed economic risks that were not factored into its calculation of premiums. Under the two-party arrangement that preexisted the viatical settlement, the insured was in a class of persons that statistically surrendered a portion of its policies or let a portion of them lapse. Insurance companies rely on these surrender and lapse rates to calculate premiums to charge for life insurance policies. The viatical provider distorts these rates, however, because it will always hold onto the policy until the insured dies in order to protect its investment. Thus, as the initial actuarial risk is distorted with each new viatical settlement, the risk-spreading profile of the insurer becomes less reflective of its initial calculations.

The insured too faces changed obligations and risks. Fundamentally, instead of relating to the insurer as an insured whose own life is the subject of financial benefits that she controls, she now relates as an insured whose death is meaningful only to financial investors. Also, while she likely subjected herself to a health examination by the insurer when she initially purchased the life insurance policy, under the tripartite arrangement with a viatical provider, she must subject herself to routine, periodic medical examinations—perhaps even monthly. She also might have unwittingly given up rights provided by her insurance policy that could have generated cash through loans or cash surrender value because she lacked adequate knowledge and information about the value of those rights. Finally, the insured is subjected to additional privacy concerns relat-

ing to her medical records and financial information. While generally these are already regulated to some degree, certain private financial and health matters nonetheless could legally become public as a result of a viatical settlement.

Not only are the parties to insurance contracts affected by viatical settlements, but the State too has interests, especially in ensuring (1) that its residents not be subjected to unscrupulous conduct by the viatical settlement providers who might defraud, harass, or abuse insureds in the State and (2) that its residents not defraud insurance companies in an effort to realize a quick financial return by entering into insurance contracts while hiding the fact that they will soon, within a determinable time, die.

■ Virginia addressed these concerns in the Virginia Viatical Settlements Act, recognizing that each party to the new tripartite arrangement has interests meriting attention and protection. The insured's privacy rights are addressed in Virginia Code § 38.2–6005; the insured's potential lack of information and knowledge about her policy and what she loses in a viatical settlement are addressed by mandating disclosures, *id.* § 38.2–6007. A requirement that the insured be of sound mind when entering into a viatical settlement is imposed in § 38.2–6008(A)(1). Section 38.2–6008 also regulates the practices of viatical settlement providers and § 38.2–6011 prohibits unfair advertising with respect to viatical settlements. The insurers are protected by being provided in advance with applications of their insureds for viatical settlements and the insured's medical records to allow the insurers to conduct fraud investigations. *See id.* § 38.2–6008(A)(3), (4). The Act requires viatical settlement providers to submit to the Commission for review and approval all viatical settlement contracts before closing, *see id.* § 38.2–6003, and they must pay viators (within three days of the change of beneficiary) a minimum percentage of the face value of the life insurance policy, *see* 14 Va. Admin. Code § 5–71–60. Finally, the Act requires that any viatical settlement provider dealing with Virginia citizens have a plan of operation, be competent and trustworthy, indicate an intention to act in good faith and in compliance with state licensing requirements, have a good business reputation, and be present within the State for purposes of regulation and enforcement. *See* Va.Code Ann. § 38.2–6002.

All of these matters, and more, regulated by the Virginia Viatical Settlements Act surely "relate to" the business of insurance in that they regulate the new ordering of the tripartite insurance arrangement involving the insurer, the insured, and the viatical settlement provider. *See* 15 U.S.C. § 1012(b). The term "relate to" as used in the McCarran–Ferguson Act is parallel to the same language used in the preemption provision of the Employee Retirement Income Security Act of 1974 ("ERISA"), as both words define the scope of preemption. In ERISA, Congress preempted "any and all State laws" that *"relate to* any employee benefit plan" covered by ERISA. 29 U.S.C. § 1144(a) (emphasis added). And of course, the McCarran–Ferguson Act narrows the preemption of the Commerce Clause by conferring commerce power to the States to enact laws that "relate to" the regulation of the business of insurance.

The Supreme Court has described ERISA's "relate to" language as "clearly expansive." *See N.Y. State Conf. of Blue Cross & Blue Shield Plans v. Travelers,* 514 U.S. 645, 655, 115 S.Ct. 1671, 131 L.Ed.2d 695 (1995). Hoping to focus judicial analysis, the Court commented that a state "law 'relates to' an employee benefit

plan, in the normal sense of the phrase, if it has a *connection with* or *reference to* such a plan." *Shaw v. Delta Air Lines, Inc.,* 463 U.S. 85, 96–97, 103 S.Ct. 2890, 77 L.Ed.2d 490 (1983) (emphasis added). But even these terms, if "taken to extend to the furthest stretch of [their] indeterminacy," would have preemption "never run its course." *Travelers,* 514 U.S. at 655, 115 S.Ct. 1671. Faced with such expansive language capable of swallowing, by its own terms, much more than Congress intended, the Court surrendered: "We simply must go beyond the unhelpful text and the frustrating difficulty in defining its key term['relate to'], and look instead to the objectives of the ERISA statute as a guide to the scope of the state law that Congress understood would survive." *Id.* at 656, 115 S.Ct. 1671.

Interpreting the "relate to" language in § 1012(a) of the McCarran–Ferguson Act, we may similarly say that it is "clearly expansive" and that a state law that has a "connection with" or "reference to" the regulation of the business of insurance is saved from the Commerce Clause's preemption. But these terms too prove to be somewhat indeterminate in the context of the McCarran–Ferguson Act. Therefore, we likewise look "to the objectives of the [McCarran–Ferguson Act] as a guide to the scope of the state law that Congress understood would" be immune from dormant Commerce Clause attack. *See Travelers,* 514 U.S. at 656, 115 S.Ct. 1671.

Congress made its objectives in passing the McCarran–Ferguson Act clear by declaring "that the continued regulation and taxation by the several States of the business of insurance is in the public interest." 15 U.S.C. § 1011. By passing the McCarran–Ferguson Act, Congress "put the full weight of its power behind existing and future state legislation" that relates to the business of insurance "to sustain it from

any attack under the commerce clause to whatever extent this may be done with the force of that power behind it." *Prudential Ins.,* 328 U.S. at 431, 66 S.Ct. 1142. It was "Congress' purpose ... to give support to the existing and future state systems for regulating and taxing the business of insurance." *Id.* at 429, 66 S.Ct. 1142.

Thus, focusing on the business of insurance insofar as it involves the marketing, sale, execution, performance, and administration of insurance contracts, Congress gave States broad authority to regulate, and we conclude that because the Virginia Viatical Settlements Act addresses these aspects of insurance contracts with Virginia residents, the Act "relates to" the regulation of the business of insurance.

■ The Virginia Viatical Settlements Act was also enacted "for the purpose of regulating the business of insurance." 15 U.S.C. § 1012(b). "The broad category of laws enacted 'for the purpose of regulating the business of insurance' consists of laws that possess the end, intention, or aim of adjusting, managing, or controlling the business of insurance." *Fabe,* 508 U.S. at 505, 113 S.Ct. 2202 (citation omitted). Just as the Virginia statute relates to the business of insurance, it also clearly "manages" and "controls" the relationship between the insurer and the insured and is "aimed at protecting or regulating" that relationship, as it dictates in what manner an insured may alter fundamental aspects of her relationship with the insurer.

Our holding that the Virginia Act was passed "for the purpose" of regulating the insurance business is bolstered by a comparison to the Supreme Court's holding in *National Securities,* where the Securities and Exchange Commission sought to rescind the merger of two Arizona insurance companies based on material misstatements made in violation of federal law during the merger process. 393 U.S. at

462–63, 89 S.Ct. 564. Arizona argued that under the McCarran–Ferguson Act, its merger law should govern the transaction. In holding that federal law governed, the Supreme Court noted that the state law was focused on protecting the insurance company's *stockholders* rather than "attempting to secure the interests of *those purchasing insurance policies*," distinguishing regulations involving stockholders from regulations involving insurance policyholders. *Id.* at 460, 89 S.Ct. 564 (emphasis added). *National Securities* thus would control here *if* the Virginia Viatical Settlements Act purported to regulate the relationship between viatical settlement providers *and their investors*—the so-called "securities" side of the viatical settlements business. But the Virginia Viatical Settlements Act regulates only the "insurance" side of the transaction—involving the providers' purchase of life insurance policies from viators—with the clear purpose of securing the interests of those originally purchasing the policies by mandating that they receive a fair price from licensed providers for the policies that become the subject of viatical settlements. Indeed, the Virginia Act states that it does not apply to the securities side of the viatical settlements business. *See* Va.Code Ann. § 38.2–6016.

Consistently, in *Fabe,* the Supreme Court upheld under the McCarran–Ferguson Act a state-created bankruptcy priority favoring insurance policyholders in bankruptcy proceedings because the state law carried out "the enforcement of insurance contracts by ensuring the payment of policyholders' claims despite the insurance company's intervening bankruptcy." 508 U.S. at 504, 113 S.Ct. 2202. Thus, if a statute assigning priority in an insurance company's bankruptcy proceedings is passed "for the purpose of regulating the business of insurance," as the Supreme Court held in *Fabe,* then surely a statute

regulating the transferability of life insurance policies is also passed for the purpose of regulating the business of insurance.

■ Indeed, in this case, we need not even rely on the full breadth of the McCarran–Ferguson Act, which protects any law that "relates to" the regulation of the insurance business or was enacted "for the purpose of" regulating such business. We can rely on the McCarran–Ferguson Act's core protection of laws that *actually regulate* the "business of insurance." The subject matter of the Virginia Viatical Settlements Act is life insurance policies issued to Virginia residents—policies that are altered by viatical settlements. As already noted above, the insured, whose life remains the insurable interest, is given new duties and has reduced rights under the policy. By introducing a third party to the transaction whose interests are different from those of the original insured, the effect of the insured's policy on the insurer's risk pool changes.

Most importantly, however, the Virginia Viatical Settlements Act regulates directly the conduct and relationships of those traditionally engaged in the insurance business—insurers and insureds. The insurers on such contracts must be given information about every viatical settlement before the settlement is entered into. *See* Va.Code § 38.2–6008(A)(3). Moreover, in connection with every such viatical settlement, the insurer is required to respond to a request for verification of coverage within a specified time or to "indicate whether, based on the medical evidence and documents provided, [it] intends to pursue an investigation regarding possible fraud or the validity of the insurance contract." *Id.* § 38.2–6008(A)(4). In addition, insurers are, under the Act, prohibited themselves from being viatical settlement providers. *Id.*

§ 38.2–6002(F). Of course, the insureds involved in viatical settlements are the principal subjects of the Virginia Viatical Settlements Act, for the Act is devoted mostly to giving them rights when they sell their financial rights in insurance contracts.

These direct regulations focused on selling insurance policies and the altering of insurance contracts surely satisfy the factors listed in *Pireno. See Pireno*, 458 U.S. at 129, 102 S.Ct. 3002 (directing courts to consider "first, whether the practice has the effect of transferring or spreading a policyholder's risk; second, whether the practice is an integral part of the policy relationship between the insurer and the insured; and third, whether the practice is limited to entities within the insurance industry"). Even as the Court in *Pireno* noted that none of the enumerated criteria was "necessarily determinative," *see id.*, the Court in *Kentucky Association of Health Plans*, considering the business of insurance in the context of ERISA, later chose to make a "clean break" from the *Pireno* factors insofar as they might be restrictive, relying on a "common-sense understanding" of whether the state law "substantially affect[ed] the risk-pooling arrangement between the insurer and the insured." *Ky. Ass'n of Health Plans*, 538 U.S. at 341, 123 S.Ct. 1471. Speaking in even broader terms, the Supreme Court has held that "[s]tatutes *aimed* at protecting or regulating [the] relationship [between insurer and insured], directly or indirectly, are laws regulating the 'business of insurance.'" *National Securities*, 393 U.S. at 460, 89 S.Ct. 564 (emphasis added).

In sum, we have little difficulty in concluding that the Virginia Viatical Settlements Act relates to the regulation of the business of insurance; was enacted for the purpose of regulating the business of insurance; and indeed regulates directly and substantially the actual business of insurance. Thus the McCarran–Ferguson Act saves the Act from any dormant Commerce Clause challenge.

Were there any residual doubt on this issue, Congress' treatment of viatical settlements under the Internal Revenue Code lays it to rest. In 1996, Congress amended the Internal Revenue Code to exclude from taxable income proceeds from the sale of a life insurance policy by a person who is terminally or chronically ill to a viatical settlement provider so long as the viatical settlement provider is "licensed ... *in the State* in which the insured resides." 26 U.S.C. § 101(g)(2)(B)(i)(I) (emphasis added). Moreover, if a State in which the insured resides does not provide for the licensing of viatical settlement providers, the insured still receives the tax benefit if the viatical settlement provider meets *both* "the requirements of sections 8 and 9 of the Viatical Settlements Model Act," *and* "the requirements of the Model Regulations ... relating to standards for evaluation of reasonable payments." 26 U.S.C. § 101(g)(2)(B)(ii)(I-II). Section 8 of the Model Act requires the viatical settlement provider to make extensive disclosures to the viator, and § 9 regulates the settlement process and post-sale relationship between the provider and the viator. *Viatical Settlements Model Act* §§ 8–9 (Nat'l Ass'n of Ins. Comm'rs 2006).

Thus, in amending the Tax Code in 1996, Congress did far more than just extend significant tax benefits to viators in § 101(g)(2). It made those tax benefits *contingent* upon the viatical settlement provider's compliance with *state* licensing requirements, and when the insured's State did not require licensing, they were contingent upon compliance with numerous safeguards found in the Model Act and regulations, including the minimum prices for policies. This incorporation of state

regulation shows Congress' concern with the pitfalls of an unregulated viatical market. It also reveals congressional trust in state regulatory measures to address these pitfalls. Most importantly, the contingency shows that Congress was aware of existing state regulation in the area and that it intended that the viatical settlement industry be regulated at the state, not federal, level.

In addition, § 101(g)(2) of the Tax Code requires not only that the viatical settlement provider be licensed, but also that it be licensed "in the State in which the insured resides." 26 U.S.C. § 101(g)(2)(B)(i)(I). This requirement contemplates a multi-state licensure regime. And it too encourages each State to pass viatical settlement laws because, if a State does not, its citizens may not receive the tax benefit, as the State cannot guarantee that providers will comply with the Model Act.

In short, in order to ensure that their citizens enjoy the tax benefit found in § 101(g)(2), States *must* enact licensing requirements. And the Virginia Viatical Settlements Act implements the very licensing regime Congress relied upon to confer tax benefits to viators under § 101(g)(2).

Life Partners relies heavily on *SEC v. Life Partners, Inc.*, 87 F.3d 536 (D.C.Cir. 1996), to argue that viatical settlements are not part of the business of insurance which is subject, by virtue of the McCarran–Ferguson Act, to state regulation. In *Life Partners*, the Securities and Exchange Commission was attempting to exercise regulatory jurisdiction over the securities' side of a viatical settlement transaction, in which the provider sells interest in the purchased policy or policies *to investors.* 87 F.3d at 540–42. The D.C. Circuit held that the investment side of the viatical transaction is not part of

the business of insurance under the McCarran–Ferguson Act. *Id.* at 541–42. But that holding has no application to this case, which deals with Virginia's efforts to regulate the insurance side of the viatical transaction—the transaction by which the policyholder sells its policy to a settlement provider. Life Partners' argument fails to distinguish the two different aspects of the viatical settlement business— the one involving the viatical settlement provider's transaction *with an insured* to purchase a policy of life insurance and the other involving the relationship between the viatical provider *and its investors* to raise money for purchasing the insurance policies. In failing to make that distinction, Life Partners also ignores the Supreme Court's holding in *National Securities,* 393 U.S. at 460, 89 S.Ct. 564.

V

■ In its cross-appeal, the Commission argues that the district court should have "abstained from exercising jurisdiction over this case out of respect for the important State interests implicated in regulating viatical settlements by Virginia citizens," citing *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971).

*Younger* abstention is a doctrine requiring federal courts to refrain from interfering with ongoing state judicial proceedings that implicate important state interests. *See Middlesex County Ethics Committee v. Garden State Bar Ass'n,* 457 U.S. 423, 432, 102 S.Ct. 2515, 73 L.Ed.2d 116 (1982). When the federal case, however, involves "an overwhelming federal interest—an interest that is . . . a core attribute of the national government . . .—no state interest, for abstention purposes, can be nearly as strong at the same time." *Harper v. Public Serv. Comm'n,* 396 F.3d 348, 356 (4th Cir.2005).

This case involves just such an interest, the commerce power. Thus, the issue in this case is not whether Virginia has an interest in regulating viatical settlements—it most certainly does—but whether Congress authorized Virginia to do so, and if not, whether Virginia's regulations violate the dormant Commerce Clause. In such cases, "the commerce power itself justifies a narrower view of state interests in the abstention context." *Harper,* 396 F.3d at 357.

Under these principles, we conclude that the district court did not abuse its discretion in declining to abstain under *Younger v. Harris.*

For the reasons given herein, we affirm the judgment of the district court.

*AFFIRMED*