# United States Court of Appeals

## FOR THE EIGHTH CIRCUIT

_____

No. 10-1696

_____

PHL Variable Insurance Company,       *
                                          *

                 Plaintiff,               *

                                             *

        v.                           *

                                           *

Lucille E. Morello 2007 Irrevocable    *
Trust, by and through its trustee, BNC  *
National Bank; David Claus;          *
Cambridge Management Group, Ltd.;   *
Cambridge Financial Group, Ltd.;    *
Jeffrey Chiaro,                     *

                                         *

              Defendants,           *

                                       *

        v.                           *  Appeal from the United States

                                       *  District Court for the

New Stream Insurance, LLC,        *  District of Minnesota.

                                       *

             Third Party Plaintiff -   *
             Appellant,            *

                                       *

        v.                           *

                                       *

PHL Variable Insurance Company,    *

                                       *

             Third Party Defendant -  *
             Appellee.            *

_____

Submitted: November 16, 2010
Filed: July 14, 2011

_____

Before SMITH, BEAM, and BENTON, Circuit Judges.

_____

SMITH, Circuit Judge.

New Stream Insurance, LLC ("New Stream") indirectly loaned an insured money to purchase a high-dollar life insurance policy from PHL Variable Insurance, Co. ("Phoenix"), a member of the Phoenix Companies, Inc. After the insured's death, it came to light that the insured had fraudulently procured the policy, prompting Phoenix to deny the death benefit, sue the beneficiaries for rescission of the insurance contract, and retain all premiums paid. In response, New Stream intervened as a third-party plaintiff, seeking a declaratory judgment that Phoenix is not entitled to retain the premiums that New Stream loaned to the insured. Eventually, the beneficiaries settled with Phoenix, and the district court,[1] over New Stream's objection, adopted the beneficiaries' and Phoenix's settlement agreement allowing Phoenix to retain the premiums. New Stream now appeals the district court's judgment. We affirm.

I. *Background*

This case involves an increasingly popular type of insurance fraud known as "Stranger Originated Life Insurance" (STOLI), "whereby," as Phoenix describes, "high face amount insurance polices insuring senior citizens are obtained for the benefit of investors with no insurable interest in the life of the insured." In the instant

_____

[1]The Honorable Michael J. Davis, Chief Judge, United States District Court for the District of Minnesota.

case, the insured was Lucille E. Morello,[2] a 78-year old retired cosmetologist who, along with her husband, had a combined net worth of roughly $800,000 and a gross annual income of approximately $30,000. The insurer is Phoenix.

In 2006, Morello's son, Jeffery Chiaro—landlord and part-time hairdresser residing in the Chicago area—was approached by one of his hair-dressing clients, Jason Mitan. Mitan, a disbarred lawyer with felony convictions for tax evasion and bankruptcy fraud, considered the idea of fraudulently acquiring life insurance for Morello. Subsequently, David Claus, one of Mitan's business associates,[3] contacted Morello and offered to provide her with free life insurance on the condition that any policies purchased on her behalf would eventually be sold to third parties. Additionally, Claus promised Morello cash payments in exchange for her complicity in the scheme.

Morello consented. Claus, operating under Cambridge's auspices, *see supra* n.3, retained Wholesale Life Insurance Brokers (WLIB), an unsuspecting insurance broker, to acquire as much standard-rate insurance coverage on Morello's life as possible. In furtherance of this goal, Claus furnished WLIB with a phony financial statement, allegedly prepared by an Illinois certified public accountant named John Abrams. The phony financial falsely set Morello's net worth as totaling nearly $34 million and her annual income as exceeding $800,000. Armed with this false profile of Morello as a high-net-worth individual seeking life insurance for the purpose of estate preservation, WLIB solicited bids from numerous insurance companies, including Phoenix. Meanwhile, Claus and Chiaro misled unsuspecting financial

---

[2]Morello is deceased and is not a party to this suit. As the insured, her death precipitated the instant action.

[3]Claus is the president, and Mitan the chief executive officer, of Cambridge Financial Group, Ltd, which, in turn, is an affiliate of another Mitan company, Cambridge Management Group, Ltd. ("Cambridge," collectively).

companies to establish a total of four trusts that would own the policies sought on Morello's life.

Phoenix took the bait from WLIB and offered to provide Morello with a life-insurance policy bearing a $10 million death benefit. On March 6, 2007, one of the trusts that Chiaro and Claus set up, the Lucille E. Morello 2007 Irrevocable Trust ("the Trust"), formally applied to Phoenix for life insurance, and reiterated Morello's fraudulent net worth and income. Along with the application, the Trust submitted a "Statement of Client Intent Form" ("SOCI Form"), which acknowledged that some of the policy premiums would be borrowed from CFC of Delaware, LLC (CFC). The SOCI Form further represented that the Trust had no intent to transfer an interest in the policy to a third party and that the policy was intended to serve estate-conservation purposes. Phoenix conditioned its coverage offer on a satisfactory investigation into Morello's assets and liabilities. Phoenix outsourced this due diligence to Examination Management Services, Inc. (EMSI), which contacted Morello via telephone to confirm the extent of her estate as detailed in her financial statement. Morello verified her massively inflated net worth and annual income, and referred the EMSI investigator to her son Chiaro, whom she claimed was also her "financial advisor." Chiaro confirmed Morello's purported worth telephonically, and, in turn, referred the investigator to Claus, who seconded Chiaro's confirmation. Based on Morello's, her son Chiaro's, and Claus's representations, EMSI transmitted its approval to Phoenix.

Thereafter, Phoenix issued life insurance policy number 97521157 ("the Policy") to the Trust, and the Trust paid insurance premiums totaling $518,562.00. Subsequently, Phoenix paid commissions to two insurance agents in the amounts of $370,771.83 and $199,634.37, respectively (a total of $570,418.20). The Trust borrowed the entire premium amount from CFC. Specifically, on March 29, 2007, CFC entered into a "Term Financing Facility Agreement" (the "Financing Agreement") with the Trust, and, pursuant thereto, loaned the Trust $542,062.00 to

-4-

cover all costs associated with the acquisition of the Policy. New Stream claims that "CFC performed essentially no underwriting or due diligence prior to making this loan to the Trust, and apparently without any regard as to whether the Trust or those behind it could ever repay the loan." In turn, New Stream, pursuant to a "Note Purchase Agreement" dated June 9, 2006, funded CFC's loan to the Trust. In making this loan to CFC, New Stream—by its own admission—likewise "failed to perform any underwriting or due diligence." New Stream received a "utilization fee" of $52,606.00 for this loan to CFC. On June 22, 2009, just prior to its intervention in this lawsuit, New Stream took an assignment of CFC's Financing Agreement with the Trust.

On October 20, 2007, within the Policy's two-year contestability period, Morello died. On December 10, 2007, the Trust applied to Phoenix for coverage under the contract. Following a routine investigation into Morello's tax filings from the preceding years, as well as other documents, Phoenix soon uncovered the fraudulent STOLI scheme, and, on February 28, 2008, brought the instant action for rescission of the Policy under Minnesota law.

Specifically, Phoenix sought the rescission of the policy as void *ab initio* due to the fraudulent misrepresentations made in the Policy application. On July 28, 2009, a little over a month after taking an assignment of CFC's Financing Agreement with the Trust, New Stream intervened as a third-party plaintiff seeking declaratory judgment that Phoenix is not entitled to retain unearned Policy premiums as setoff against the commissions it paid in connection with the Policy.

On September 14, 2009, Phoenix, as well as defendants Claus and Chiaro, filed a "Joint Motion for Entry of Judgment" ("Joint Motion") based on a settlement agreement stipulating fraud in connection with the Policy application. The parties moved the district court to rescind the policy *ab initio*, and enter judgment in Phoenix's favor with Phoenix retaining all unearned premiums on the policy as setoff

against the commissions and other damages. New Stream opposed the Joint Motion, and, on December 18, 2009, the district court heard oral arguments on the matter. On March 3, 2010, the district court entered an order adopting the parties' settlement agreement, rescinding the Policy *ab initio*, and authorizing Phoenix to retain the premiums. In so concluding, the district court reasoned first that, "[p]ursuant to Minnesota law, a life insurance policy should be declared void when there is a statement made, in procuring the insurance, that is willfully false or intentionally misleading." Second, the district court determined that "under Minnesota law, where the insurer is induced to enter into a contract for insurance by the actual fraud of the insured, the insurer is not required to return the premiums paid."

## II. *Discussion*

On appeal, New Stream argues that the district court erred in applying the procured-by-fraud exception to the general rule that "rescission requires the return of unearned premiums." Specifically, New Stream acknowledges that "[a]lthough some courts have found a fraud 'exception' to the general rule that rescission requires the return of unearned premiums, the reasoning underlying these decisions has no application in a case involving a third-party lender." Phoenix counters, in accordance with the district court's analysis, that the Minnesota Supreme Court has held consistently that, when an insured procures an insurance policy by fraud, no premiums need be returned.

We review de novo the district court's interpretation of state law. *City of Jefferson City, Mo. v. Cingular Wireless, LLC*, 531 F.3d 595, 599 (8th Cir. 2008). Moreover, we are bound by the decisions of the Minnesota Supreme Court in interpreting Minnesota law, and, insofar as the Minnesota Supreme Court has not decided this precise issue, "we must determine what that court would probably hold if it were called upon to consider the issue." *Id.* (quotation and citation omitted).

Minnesota law forecloses New Stream's appeal. In the seminal case of *Taylor v. Grand Lodge A.O.U.W. of Minnesota*, the Minnesota Supreme Court held that the general rule requiring return of premiums in the event of rescission is inapplicable when the underlying policy was procured by the actual fraud of the insured. 105 N.W. 408, 411 (Minn. 1905). In *Taylor*, the insured decedent had applied for and gained membership into the Grand Lodge of the Ancient Order of United Workmen of the State of Minnesota, an organization that provided life insurance to its members. *Id.* at 409. As a membership limitation, the Grand Lodge disallowed any new members older than 45. *Id*. Upon the insured's death, his wife applied for the death benefit, and Grand Lodge soon discovered that the insured had falsified his age on his original membership application, concealing his real age of 47. *Id.* The Lodge sued to rescind the insurance contract as void *ab initio* because it was procured by fraud. *Id.* at 410. The Minnesota Supreme Court, in holding that the trial court erred in concluding that rescission required the return of the premiums paid, stated the following rule:

> Although not expressly stated in all the cases which recognize the right to the return of the premium [in the event of rescission], there is a well-recognized exception by which the insurer is relieved from any duty to return the premium when it was induced to enter into the contract by the actual fraud of the insured. In this case, the trial court found in substance that the untrue statement as to his age was knowingly made by the applicant for the fraudulent purpose of obtaining membership in the lodge. It was, then, a case of actual fraud, not a mere innocent or unintentional breach of warranty or conditions.

*Id.* at 411.

Ten years later, in *National Council of Knights & Ladies of Security v. Garber*, the Minnesota Supreme Court affirmed *Taylor*'s rule under virtually identical facts:

> If intentional fraud on the part of the insured rendered the contract void, the insured is not entitled to a return of the premiums under any

circumstances; but if the contract is rendered void ab initio by reason of the fact that a warranty which formed a part thereof is not true, and the insurer brings an action to have the contract declared void and annulled upon that ground, and in such action the insured establishes that he made the warranty in good faith without intent to deceive or mislead, the court may require a return of the premiums as a condition to the entry of a judgment declaring the contract canceled and annulled.

154 N.W. 512, 513 (Minn. 1915).

Likewise, in *Madden v. Interstate Business Men's Accident Ass'n*, the Minnesota Supreme Court, citing to *Taylor* and *Garber*, confirmed that "the law in this state in accord with that elsewhere is that when a policy is canceled for a false representation preventing the attaching of the risk the insured is entitled to a return of the premium, *unless the representation was fraudulent*, in which case he is not." 165 N.W. 482, 482 (Minn. 1917) (emphasis added).

To counter this clear language by the Minnesota Supreme Court, New Stream argues only that the underlying rationale of this rule is to prevent insurance fraud from becoming a zero-sum game in which the insured bears no pecuniary risk in attempting to perpetrate fraud. New Stream contends that this case, in contrast, presents no such concern because, by virtue of the assignment New Stream received from CFC, New Stream—an innocent third-party lender—will immediately take possession of the returned premiums. However, New Stream cites no Minnesota case compelling the return of the premiums to a fraudulent insured, or her assignee, on that basis. Moreover, although the Minnesota Supreme Court likely did not anticipate or account for the complexities of modern-day structured finance when it crafted its procured-by-fraud exception, that alone does not give this court, which presently sits in diversity, license to ignore Minnesota's interpretation of its own law. The record reflects that Morello, in collaboration with Chiaro, Claus, and Mitan, purposefully falsified Morello's financial profile to dupe Phoenix into issuing an insurance policy

-8-

for which she was not actually qualified. Under the Minnesota Supreme Court's analysis in *Taylor* and its progeny, these "untrue statement[s] . . . knowingly made" by Morello and her cohorts "for the fraudulent purpose of obtaining [insurance]" constitute "actual fraud," which rendered the insurance contract void at its inception and presently relieves Phoenix of any duty it otherwise may have owed to return premiums already paid. *Taylor*, 105 N.W. at 410.

Accordingly, based on the Minnesota Supreme Court's precedents, we affirm the district court's decision recognizing Phoenix's right under Minnesota law to retain the premiums paid on a fraudulently procured insurance policy.

### III. *Conclusion*

The judgment of the district court is affirmed.

_____